Filed 1/25/16  P. v. Payrovi CA6

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>MEHDI PAYROVI,<br><br>    Defendant and Appellant. | H040771<br>(Santa Clara County<br>Super. Ct. No. C1353576) |

A jury found defendant Mehdi Payrovi guilty on five counts of forcible lewd acts on a child under 14 and one count of a lewd or lascivious act on a child aged 14.  (Pen. Code, §§ 288, subds. (b)(1), (c)(1).)[1]  The jury found allegations that defendant committed the offenses against more than one victim to be true.  (§ 667.61, subds. (b), (e)(4).)  The trial court sentenced defendant to an aggregate term of 75 years to life consecutive to two years in prison.

Defendant raises several claims on appeal.  As to the younger victim (O.D.), defendant contends the evidence is insufficient to prove he used force in committing any of the four lewd acts on her.  As to the older victim (D.D.), defendant contends the evidence is insufficient to prove both intent and force with respect to one of the lewd acts on her.  Finally, he contends his sentence constitutes cruel and unusual punishment.

---

[1] Subsequent undesignated statutory references are to the Penal Code.

We conclude the evidence was sufficient to support the convictions on all counts. We further conclude the sentence does not constitute cruel and unusual punishment. Accordingly, we will affirm the judgment.

## I. FACTUAL AND PROCEDURAL BACKGROUND

Defendant was born in Iran in 1947 and emigrated to the United States when he was 35 years old. At the time of the offenses, he was retired and drank a third of a bottle of whiskey every day. He was the step-grandfather of the two victims, D.D. and her younger half-sister O.D. The girls have four other sisters or half-sisters. Defendant lived with the victims' grandmother in San José.

A. *Facts of the Offenses*

1. *Lewd Acts on D.D.*

D.D. was 16 years old when she testified at trial. She was born in November 1996. Defendant was married to D.D.'s maternal grandmother (Grandmother). D.D. had known defendant since she was around 3 years old. It was a normal practice for D.D. to exchange hugs and kisses on the cheek with defendant when they met. After D.D.'s parents separated in September 2012, D.D. moved into Grandmother's house, where defendant was also living.

When D.D. was around 13 or 14, she noticed defendant looking at her in a sexual manner. When she was 14 or 15, defendant began lingering during his hugs with her, and the way he was putting his hands and arms on her made her feel uncomfortable. On her fifteenth birthday, the family took a trip to the Bahamas. While D.D. was wearing a bikini, defendant leered at her and told her how attractive she was. When she was around 15 or 16, defendant's kisses moved from her cheeks to her lips, and he would hug her to the point where he had an erection. When he hugged her, he would "cop a feel," touching her breasts, the area around her vagina, or her buttocks, through her clothes. D.D. estimated this touching happened about five times on each of those areas of her body.

2

The conduct underlying Count Six occurred in July 2010, after funeral services for defendant's mother. After the funeral, D.D., who was 13 at the time, spent the night at Grandmother's house. While D.D. was preparing to go to sleep, defendant walked into her bedroom and approached her. D.D. testified that defendant "pretty much grabbed me and kissed me. And he tried to use his tongue in a way. And I was kind of pushing him off, you know, saying that I need to go to bed and just trying to, like, you know, get him away." She added that defendant "was kind of leaning on me to the point where I was going to fall on the bed." D.D. testified she felt defendant's erection on her leg, and he was touching her buttocks. He told her she was beautiful and said, "Just one more, one more kiss," but she told him she had to go to bed. D.D. testified that "I just kept pushing him off, and pretty much I was just trying to get him away from me," but defendant did not let her push him away. When she tried to push him away, he grabbed her hand and put it on his penis area. Defendant stopped when Grandmother came up the stairs.

On cross-examination, D.D. testified that, on the night of the funeral, defendant was drunker than she had ever seen him before. As to defendant's leaning against her during the hug, she admitted that he had lost his balance in his drunken state, and that he probably would have fallen over if he had not been holding onto her.

D.D. told Grandmother about the incident, and Grandmother acknowledged that she had seen defendant looking at D.D. in a sexual manner. Grandmother talked to defendant about it, but his behavior did not stop.

Defendant engaged in similar conduct after D.D. turned 16 years old. In one incident, when D.D. came out of her room, she saw defendant standing in the hallway. She tried to go back to her room, but defendant stopped her, told her he was sexually attracted to her, and asked for a kiss. D.D. said, "No. That's not right. I need to go to my room." She tried to leave, but defendant grabbed her and kissed her with his tongue. He was touching her breasts and her buttocks, and he was trying to get her to touch him. She was able to push him away and she told him to stop. At that point, Grandmother

3

walked in and defendant walked away. D.D. told Grandmother about the incident. Grandmother told her to stay locked in her room and promised to talk to defendant about his conduct.

D.D. testified that defendant never threatened to hurt her physically, and he never became angry with her. D.D. never felt afraid defendant would physically harm her, and he never threatened to inflict harm or hardship on anyone else either.

At some point, O.D. told D.D. that defendant was looking at her (O.D.) and giving her hugs that made her feel uncomfortable. O.D. had told Grandmother as well, but Grandmother had not done anything to stop it. D.D. then told her boyfriend about defendant's conduct; her boyfriend prompted D.D. to disclose it to a school counselor. The counselor relayed the complaint to police, who then interviewed the family and arrested defendant.

2. *Lewd Acts on O.D.*

O.D. was born in April 2003. She was 10 when she testified at trial. O.D. also gave an interview to the police at the Child Interview Center in April 2013. The prosecution played a video of the interview for the jury and provided jurors with a transcript of the interview. The parties also introduced portions of O.D.'s testimony from the preliminary hearing.

O.D. said that, when she was around seven or eight years old, defendant began touching her in a way that made her uncomfortable. On multiple occasions, defendant kissed her neck in a way she did not like. He would also kiss her on the lips. O.D. once told him, "I don't like it. That's it." But defendant replied, "No. One more." Once, when O.D. was in the bathroom, defendant tried to come in, so she slammed the door on him and kept it shut with her foot. On another occasion, defendant leered at O.D.'s crotch area while she was performing a gymnastics trick.

O.D. began to avoid greeting defendant because she did not want him to kiss her. Defendant asked why she was avoiding him while her sisters still hugged him. On one

4

occasion when O.D. refused to let him kiss her, he told her, "Okay fine then. I don't want to ever talk to you again." O.D. testified that most of the times when defendant touched her in a way that made her uncomfortable, she would try to get away. Sometimes he would let her get away, and "sometimes he would grab me or something." Defendant never got angry or yelled at O.D. He never threatened to punish her or spank her, but Grandmother would get mad at O.D. and tell her to greet defendant. O.D. testified that she had been brought up to respect her elders. She testified that defendant was bigger and stronger than her.

O.D. gave testimony and statements about four specific lewd acts, which the prosecution charged in four counts:

a. *Count Two—While Watching Television and Sitting on Defendant's Lap*

O.D. testified that she and defendant were sitting on a couch watching television at his house. Defendant asked O.D. to sit on his lap. While O.D. was on his lap, defendant put his hand inside her underwear. In her testimony, O.D. could not recall how long his hand was there or what he did with his hand. She could not recall whether he put his fingers inside her.

In her statement to police, O.D. had stated defendant did not put his fingers inside her. She also said he rubbed or massaged her vagina. In her preliminary hearing testimony, she testified that his fingers went "into the flaps," but she did not know if he went in "any further than the flaps." She also testified that "he went with the fingers in my vagina." On cross-examination at the preliminary hearing, she testified that defendant's fingers did not go inside her vagina.

At trial, O.D. testified that she felt uncomfortable having defendant's hand on her vagina. Also, while she was sitting on his lap, she felt a "bump" in his crotch area. When the prosecutor asked whether defendant held her on his lap, O.D. testified as follows:

5

"[Q.] The time when you talked about watching TV and sitting on his lap—was that one of the times that he grabbed you and held you there?

"[A.] Oh, yeah. He wouldn't let me go. Like, I wanted to sit on another couch. Then, eventually, when I said, 'Stop,' he's, like, 'You don't like it?' I was, like, 'Yeah.' And he was, like, 'You want to sit on the other couch?' I think. I—I don't know."

In her interview with police at the Child Interview Center, O.D. said she felt defendant was holding her down when she was sitting on his lap:

"[Q.] And at that time when you were sitting on his lap and he was touching your [vagina] um, did you feel like you could get up?

"[A.] Um, yeah he kinda holded me down like stop so and then after that I—I could get up.

"[Q.] Okay. So when you were kinda trying to get up you felt like he was holding you down?

"[A.] Mm-hm."

In her testimony at the preliminary hearing, O.D. testified as follows:

"[Q.] When he was doing that, were you trying to sort of wiggle away and get away or were you just sort of sitting there?

"[A.] I was putting my arms like this and telling him to stop. And he's, like, 'I didn't know you felt that way.' And then I, like, went to the bathroom.

"[Prosecutor:] And, for the record, the witness sort of gestures with both of her elbows extending from her sides out and away from the body in an upward motion.

"[Q.] When he was—and you were sitting on his lap when—when he did that?

"[A.] (Nod.)

"[Q.] And was he holding onto you at the same time?

"[A.] I don't remember.

"[Q.] Did he told—when you asked him to stop, did he stop right away?

"[A.] Um, like, ten seconds after.

"[Q.] And were you trying to get away at that point?

"[A.] Uh-huh. Yes.

"[Q,] Thank you. And was he sort of holding you there at that point?

"[A.] Like, what do you mean?

"[Q.] Like, as you're trying to kind of get away and you said, 'Stop,' did he keep—sort of keep ahold of you on top of him?

"[A.] Mm-hmm. And then he let go after ten seconds."

b. *Count Three—The Massage*

O.D. testified about an incident in which defendant massaged her under her shirt. She was lying down while working on her homework and watching television. Defendant approached her and asked if she wanted a massage. She told him she did not want a massage because she was doing homework, but he insisted on massaging her. He put his hands underneath her shirt and massaged the upper part of her body, including her breast area. As to whether defendant restrained her, O.D. testified as follows:

"[Q.] Okay. Did you try to get away while he was doing that?

"[A.] I was, like, wiggling. I was, like, 'Stop. I don't like that. I'm doing my homework.' He's, like, 'Okay. Fine. Good night.'

"[Q.] Did he stop as soon as you told him to stop?

"[A.] I think probably. I don't know.

"[Q.] Last time you came to court did you tell me that he kept doing it after you asked him to stop for at least ten seconds?

"[A.] Yes.

"[Q.] Is that true?

"[A.] Yeah."

### c. *Count Four—While in the Pool*

O.D. testified that defendant once put his hand inside the front of her bikini bottom while they were at the pool. When asked whether defendant held her there, O.D. testified as follows:

"[Q.] How about the time when you were in the pool with him? Did you want to get away, and did he hold you there?

"[A.] I—I got away when I swam from him when we were, like, playing tag, I guess. Yeah, we were playing tag. And then he, like, grabbed me.

"[Q.] What did he do after he grabbed you?

"[A.] I think it was just like a tag, you know. We were playing a game. And then—and then I got sunk under water. And then I was, like, 'I don't like, like, sinking under water after I get tagged,' you know.

"[Q.] And when he was touching you while you were wearing your bikini, your bathing suit, were you trying to get away?

"[A.] Yes.

"[Q.] Did he let you?

"[A.] I don't know. I'm—I'm not sure."

In her interview with police at the Child Interview Center, O.D. described the incident as follows:

"[Q.] One time we were in the swimming pool and then he jumped in and then um, I was like on the like I was teaching my sister how to swim and I was letting her learn to kick and then he's like come here. And I was like, okay. And then he did it and I—I swimmed away and then he pushed me down to the water and I couldn't get up so I (unintelligible) grab and then um, he got me up and then um, I told him and I got out of the pool and told my sister to get out too."

When asked specifically about the touching, O.D. said, "There's a step in my grandma's swimming pool and then um, he came and touched and went under my

8

bathing suit and touched it and then he went under though." She added that "he just massaged it like he did." In response to further questions, she answered as follows:

"[Q.] And you said that his hand went under the bathing suit. Describe that to me.

"[A.] Um, he went um, under um, the body—under the body piece to the [vagina].

"[Q.] Okay and what happened when his hand touched the—the [vagina]?

"[A.] Uh, I said stop and I—I swimmed to—and then he pushed me down and I swimmed and then I got out and I told my sisters to get out too."

d. *Count Five—Kissing O.D.'s Beauty Marks*

O.D. testified that when she was around seven or eight years old, defendant "kissed every beauty mark or mole I had." O.D. told defendant to stop, but he did not stop right away. When asked if she tried to get away, O.D. testified, "I don't remember. Probably." In her interview with police at the Child Interview Center, she stated that when he started kissing her, "I like stopped him and pushed him away."

At the preliminary hearing, O.D. testified about the incident as follows:

"[Q.] What did you say when he said he would kiss every mole on your body?

"[A:] I just said, 'Okay.' And, like, I really don't know why.

"[Q:] The places he kissed were your ear, your neck, your arm, and your armpit; is that right?

"[A:] Yes.

"[Q:] Did he try to kiss any other part of your body on that occasion?

"[A:] Yes. And I said, 'I don't not—I don't like this game.'

"[Q:] Okay. Where—where else did he try to kiss?

"[A:] I don't know. That's all I remember.

"[Q:] Did he move your clothes around at all during this game?

"[A:] No.

"[Q:] Did he put his hands under your clothes during this game?

"[A:] No."

9

Further questioning about the incident elicited the following testimony:

"[Q:] And where did he start kissing? Like, where—what moles did you show him first or what mole?

"[A:] I didn't show him everything. He just saw. And he started kissing my ear because I have moles on my ear.

"[Q:] So he started kissing on your ear?

"[A:] (Nod.)

"[Q:] Did he kiss anywhere else while he was doing that?

"[A:] Yeah. The neck and the arm and the armpit.

"[Q:] And was he holding onto you when he was doing that?

"[A:] Yes.

"[Q:] And what were you doing?

"[A:] I said, 'Stop.'

"[Q:] Okay. And did he stop right away?

"[A:] No.

"[Q:] How long—did he stop at some point?

"[A:] Yes.

"[Q:] How long did it take before he stops?

"[A:] I don't know. It was a long time ago.

"[Q:] So when he was kissing you on your ear, was that the—you said that was the first place he started; right?

"[A:] Uh-huh.

"[Q:] And did you tell him right then to stop?

"[A:] Yes.

"[Q:] Okay. And he kept doing it long enough to also kiss you on your neck?

"[A:] Uh-huh."

### 3. *Defendant's Statement to Police*

Defendant gave a statement to police after he was arrested. The prosecution played an audio recording and provided transcripts of the statement to the jury. Defendant stated he was an alcoholic and that he drank a third of a bottle of whiskey every day. He described D.D. as "beautiful" and "very attractive." He said Grandmother had told him D.D. had accused him of kissing her. Initially, defendant stated that he had told Grandmother the allegation was true, but that he had not actually kissed D.D. Defendant then admitted that he had in fact kissed D.D., and that it had happened four times, but he claimed D.D. had initiated these encounters and he could not resist her. He denied having any sexual contact with O.D.

### B. *Procedural Background*

In the first amended information (the operative pleading), the prosecution charged defendant with: Count One—sexual penetration of a child aged 10 or younger (§ 288.7, subd. (b)); Counts Two through Five—lewd or lascivious act on O.D., a child under 14, by force, violence, duress, menace or fear (§ 288, subd. (b)(1)); Count Six—lewd or lascivious act on D.D., a child under 14, by force, violence, duress, menace or fear (§ 288, subd. (b)(1)); and Count Eleven—lewd or lascivious act on D.D., a child aged 14 (§ 288, subd. (c)(1)).[2] As to Counts Two through Six, the information alleged defendant committed the offense against more than one victim. (§ 667.61, subd. (b), (e)(4).)

The case proceeded to trial in August 2013. At the close of evidence, the trial court granted defendant's motion to dismiss Count One for insufficient evidence. The jury found defendant guilty on all remaining counts. The jury also found all enhancements to be true.

The trial court imposed an aggregate term of 75 years to life consecutive to two years in prison. The sentence consisted of consecutive terms of 15 years to life for each

---

[2] The prosecution dismissed Counts Seven through Ten on the eve of trial.

11

of Counts Two through Six consecutive to the middle term of two years for Count Eleven.

## II. DISCUSSION

### A. *Sufficiency of the Evidence*

Defendant contends the evidence pertaining to Counts Two through Five is insufficient to prove he used force to commit the lewd acts on O.D. He also contends the evidence pertaining to Count Six is insufficient to prove he harbored the requisite intent or that he used force in the lewd act on D.D. The Attorney General argues the evidence is sufficient to support all five counts. We conclude the evidence was sufficient to support the convictions on all counts.

### 1. *Legal Principles*

In reviewing a claim of insufficient evidence, we review the whole record in the light most favorable to the prosecution to determine whether the record discloses substantial evidence to support the conviction. (*People v. Halvorsen* (2007) 42 Cal.4th 379, 419.) "Substantial evidence" is evidence that is "reasonable, credible, and of solid value" such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. (*People v. Johnson* (1980) 26 Cal.3d 557, 578.) "An appellate court must accept logical inferences that the jury might have drawn from the evidence even if the court would have concluded otherwise." (*People v. Combs* (2004) 34 Cal.4th 821, 849.) Similarly, under the federal constitution, we ask "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." (*Jackson v. Virginia* (1979) 443 U.S. 307, 319, original italics.)

Subdivision (b)(1) of section 288 punishes lewd acts committed "by use of force, violence, duress, menace, or fear of immediate and unlawful bodily injury on the victim or another person . . . ." (§ 288, subd. (b)(1).) "Force" means force that is " 'substantially different from or substantially greater than that necessary to accomplish

the lewd act itself.' " (*People v. Soto* (2011) 51 Cal.4th 229, 242.) "According to the majority of courts, this includes acts of grabbing, holding and restraining that occur in conjunction with the lewd acts themselves." (*People v. Alvarez* (2009) 178 Cal.App.4th 999, 1005, citing *People v. Bolander* (1994) 23 Cal.App.4th 155, 160-161 ["defendant's acts of overcoming the victim's resistance to having his pants pulled down, bending the victim over, and pulling the victim's waist towards him" constituted forcible lewd conduct]; *People v. Neel* (1993) 19 Cal.App.4th 1784, 1790 ["defendant's acts of forcing the victim's head down on his penis when she tried to pull away and grabbing her wrist, placing her hand on his penis, and then 'making it go up and down' " constituted forcible lewd conduct]; *People v. Babcock* (1993) 14 Cal.App.4th 383, 388 [force element met where the defendant grabbed the victims' hands and made them touch his genital area].)

"Duress" means " 'a direct or implied threat of force, violence, danger, hardship or retribution sufficient to coerce a reasonable person of ordinary susceptibilities to (1) perform an act which otherwise would not have been performed or, (2) acquiesce in an act to which one otherwise would not have submitted.' " (*People v. Schulz* (1992) 2 Cal.App.4th 999,1005.) "[D]uress involves psychological coercion. [Citation.] Duress can arise from various circumstances, including the relationship between the defendant and the victim and their relative ages and sizes. [Citations.] 'Where the defendant is a family member and the victim is young, . . . the position of dominance and authority of the defendant and his continuous exploitation of the victim' is relevant to the existence of duress. [Citation.]" (*Ibid.*)

Section 288 sets forth the requisite specific intent as "the intent of arousing, appealing to, or gratifying the lust, passions, or sexual desires" of either the accused or the child. (§ 288, subd. (a); see *People v. Warner* (2006) 39 Cal.4th 548, 556 [section 288 offense requires specific intent].) "[T]he manner of touching is not irrelevant . . . . '[T]he trier of fact looks to all the circumstances, including the charged act, to determine whether it was performed with the required specific intent.' [Citations.] Other relevant

factors can include the defendant's extrajudicial statements [citation], other acts of lewd conduct admitted or charged in the case [citations], the relationship of the parties [citation], and any coercion, bribery, or deceit used to obtain the victim's cooperation or to avoid detection [citation]." (*People v. Martinez* (1995) 11 Cal.4th 434, 445.)

2. *Evidence of Force as to Counts Two through Five*

As to Count Two, O.D. testified that defendant put his hand inside her underwear and massaged her vagina while she sat on his lap watching television. At trial, she testified that she wanted to move to another couch, but defendant held her on his lap and "[h]e wouldn't let me go." Similarly, in her interview with police, O.D. stated that "he kinda holded me down" when she tried to get up. At the preliminary hearing, she demonstrated her attempt to free herself by moving her elbows out from her side and in an upward motion. She testified that he continued to hold her in his lap and then let her go after ten seconds. This evidence is sufficient to support a finding of force " 'substantially different from or substantially greater than that necessary to accomplish the lewd act.' " (*People v. Soto* (2011) 51 Cal.4th 229, 242.)

As to Count Three, O.D. testified that defendant put his hands under her shirt and massaged her upper breast area while she was working on her homework in front of the television. In response to the prosecutor's question whether she tried "to get away while he was doing that," O.D. testified she was "wiggling," but she did not say whether he held her down or how he responded to her wiggling. She told him to stop, and he responded, "Okay. Fine. Good night." In her testimony, O.D. was not sure whether defendant stopped at that point, but she agreed that she had previously testified that he continued to massage her breast area for at least ten seconds. The jury reasonably could have inferred from this testimony that defendant used force to restrain O.D. while she was attempting to get away from defendant. We thus conclude the evidence was sufficient to support a finding of force as to Count Three.

14

As to Count Four, O.D. testified that defendant put his hand inside the front of her bikini bottom while they were at the pool. When the prosecutor asked whether he held her there, she testified that she swam away from him, whereupon he grabbed her and she "got sunk under water." She testified that getting sunk under water was part of a game of tag. When the prosecutor asked if defendant let her swim away, she responded, "I don't know. I'm—I'm not sure." Similarly, in her interview with police, O.D. stated that after "he did it" and she swam away, "he pushed me down to the water," whereupon she got out of the pool. We conclude the jury could have inferred from this testimony that defendant used force on O.D. as she was attempting to swim away and escape the lewd act. This evidence was sufficient to establish the element of force in Count Four.

As to Count Five, O.D. testified that defendant "kissed every beauty mark or mole I had." She told him to stop, but he did not stop right away. At trial, O.D. could not recall whether she tried to get away. In her interview with police, she stated that she stopped him and pushed him away. At the preliminary hearing, she testified that defendant was holding onto her while kissing her. When he kissed the moles on her ear, she told him to stop. He did not stop right away, but continued kissing her until he kissed her neck, arms, and armpit. Because O.D. testified that defendant held onto her while refusing her plea to stop, we conclude this evidence is sufficient to support a finding of force in Count Five.[3]

In summary, we conclude the evidence is sufficient to support the convictions on all four counts concerning the lewd acts on O.D.

---

[3] In describing this incident, the Attorney General's brief quotes testimony and statements O.D. gave about an incident in which the defendant grabbed her by the arm while kissing her on the neck. But this evidence concerned a separate incident, not the incident described in Count Five.

### 3. *Evidence of Intent and Force as to Count Six*

As to Count Six, D.D. testified that defendant grabbed her, kissed her, and groped her buttocks on the night of his mother's funeral. He also grabbed her hand and put it on his penis. D.D. testified that she was "kind of pushing him away" and trying to "get him away," but defendant did not let her push him away. She testified that defendant "was kind of leaning on me to the point where I was going to fall on the bed." She also testified, however, that he had lost his balance in his drunken state, and that he probably would have fallen over if she had not held him up.

Defendant contends the evidence was insufficient to prove the requisite level of intent. He points to his degree of intoxication and the fact that "[t]he incident did not involve a series of complicated physical maneuvers, such as directing [D.D.] to a bed, undressing her and engaging in various sex acts, such as oral copulation or actual penetration, which had they occurred might have shown sufficient sobriety on Appellant's part to demonstrate the existence of the required intent." He adds that hugging and kissing were common among the family members and that the evidence was "consistent with a non-sexual plea for affection and compassion." But defendant groped D.D.'s buttocks and put her hand on his penis. These actions went well beyond customary hugs or familial kisses. Furthermore, D.D. could feel that defendant had an erection. We conclude this evidence was sufficient to support a finding that defendant harbored the required intent to commit the lewd and lascivious act alleged in Count Six.

Defendant also contends the evidence was insufficient to prove force. We disagree. D.D. testified that she attempted to push defendant away, but he resisted. Defendant also grabbed D.D.'s hand and physically placed it on his penis. We conclude this evidence was sufficient to establish the use of force. See *People v. Babcock*, *supra*, 14 Cal.App.4th at p. 388 [force element met where the defendant grabbed the victims' hands and made them touch his genital area].) Accordingly, we find the evidence sufficient to support Count Six.

16

B. *Cruel and Unusual Punishment*

The trial court imposed an aggregate term of 75 years to life consecutive to two years in prison. The sentence consisted of five consecutive 15-year sentences for Counts Two through Six, consecutive to the midterm two-year sentence for Count Eleven. The Penal Code mandates full, separate, consecutive terms for each of Counts Two through Six because the offenses involved separate victims or the same victim on separate occasions. (§ 667.5, subds. (d), (e)(5).) Defendant contends this sentence constitutes cruel and unusual punishment under the Eighth Amendment to the United States Constitution and article I, section 17 of the California Constitution. The Attorney General contends the sentence does not violate either constitution. We conclude the sentence is not cruel or unusual under either constitution.

The Eighth Amendment provides, "Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted." "To determine whether a punishment is cruel and unusual, courts must look beyond historical conceptions to ' "the evolving standards of decency that mark the progress of a maturing society." ' " (*Graham v. Florida* (2010) 560 U.S. 48, 58 [quoting *Estelle v. Gamble* (1976) 429 U.S. 97, 102].) "The concept of proportionality is central to the Eighth Amendment. Embodied in the Constitution's ban on cruel and unusual punishments is the 'precept of justice that punishment for crime should be graduated and proportioned to [the] offense.' " (*Graham v. Florida*, *supra*, 560 U.S. at p. 59 [quoting *Weems v. United States* (1910) 217 U.S. 349, 367].)

Under state law, the "[i]mposition of a sentence 'grossly disproportionate to the offense for which it is imposed' is a violation of the prohibition against cruel or unusual punishment under article I, section 17, of the California Constitution." (*People v. Kaurish* (1990) 52 Cal.3d 648, 716.) In determining whether a sentence is cruel and unusual, California courts: (1) review the nature of the offense and the offender; (2) measure the challenged punishment against those imposed for more serious crimes in

17

the jurisdiction; and (3) measure the challenged punishment against those imposed for the same crime in other jurisdictions. (*In re Lynch* (1972) 8 Cal.3d 410, 425-427 (*Lynch*).) "Defendant must overcome a 'considerable burden' to show the sentence is disproportionate to his level of culpability." (*People v. Em* (2009) 171 Cal.App.4th 964, 972, citing *People v. Wingo* (1975) 14 Cal.3d 169, 174.) Because the claim concerns a mixed question of fact and law, we exercise independent review. (*People v. Meeks* (2004) 123 Cal.App.4th 695, 707.)

Defendant contends his sentence is disproportionate under the first prong of the *Lynch* test. We agree with defendant that, on balance, his personal circumstances weigh in his favor. He had no prior criminal record and he is nearly 70 years of age. Defendant received a score of -2 on the Static-99R test, placing him in the low range of risk relative to other adult male sex offenders. According to a forensic psychologist's report submitted by defendant for his sentencing hearing, defendant is not a pedophile and his risk of committing a future sex offense is in the very low range.

However, the facts of the offenses outweigh defendant's personal circumstances. Defendant committed multiple instances of forcible lewd acts against two victims. One of the victims was under 10 years of age at the time. As a family member, defendant abused his position of trust, and he arguably used some degree of psychological coercion or familial authority to accomplish his offenses. Furthermore, he continued to deny responsibility for the offenses against the younger victim.

Defendant contends his sentence is disproportionate when compared with the statutory punishments for other, more serious offenses under California law. For example, the sentence for first degree murder is 25 years to life—a third of the sentence defendant received. (§ 190, subd. (a).) This is accurate, but defendant was convicted of multiple offenses against multiple victims. Multiple convictions of murder against multiple victims would mandate a minimum sentence of life in prison without the

18

possibility of parole, and the defendant would be eligible for the death penalty.  (§ 190.2, subd. (a)(3).)

Defendant presents two newspaper articles documenting cases in which a defendant received a lesser sentence for what defendant contends were more egregious offenses.  In the first case, a Missouri man received a 20-year sentence for what the article described as "his role in the years-long sexual torture of a 'mentally deficient' young woman that included electrical shock and mutilation."  But the defendant in that case pleaded guilty to a single count of having a sexual relationship with a minor.  Had he been convicted of all 11 counts against him, he would have faced life in prison.  In the second case, a San José man received eight months of home arrest and three years of probation for two sexual encounters involving a 15-year-old victim and a 17-year-old victim.  The defendant pleaded no contest to one count of a lewd and lascivious act on a minor aged 14 or 15, and one count of oral copulation with a minor.  The court imposed the sentence based on what the prosecutor described as " 'a very well thought out, articulated explanation' of why he was not handing out jail time that involved 'balancing the totality of the circumstances.' "  Neither of these examples demonstrates the disproportionality of defendant's sentence here.

Defendant cites several cases in which a reviewing court considered a sentence to constitute cruel and unusual punishment.  In *Ramirez v. Castro* (9th Cir. 2004) 365 F.3d 755, the Court of Appeals for the Ninth Circuit affirmed the grant of a writ of habeas corpus challenging a sentence of 25 years to life for shoplifting a $199 videocassette recorder.  In *Reyes v. Brown* (9th Cir. 2005) 399 F.3d 964, the Ninth Circuit vacated the denial of a writ of habeas corpus challenging a sentence of 26 years to life for perjury on a driver's license application.  In *Banyard v. Duncan* (C.D. Cal. 2004) 342 F.Supp.2d 865, a federal district court granted a writ of habeas corpus challenging a sentence of 25 years to life for possession of a fraction of a gram of cocaine.  And in *People v. Carmony* (2005) 127 Cal.App.4th 1066, the Third District Court of Appeal reversed a

sentence of 25 years to life for a technical violation of sex offender registration requirements. These cases all involved sentences imposed for offenses substantially less serious and injurious than defendant's offenses. Contrary to his argument that these cases support his claim, these cases illustrate how rarely courts grant relief on this type of claim and how disproportionate a sentence must be as compared with the seriousness of the offense.

While defendant's sentence may be harsh in light of his personal circumstances, the nature of his offenses is very serious. We thus conclude defendant's sentence of 75 years to life consecutive to two years does not constitute cruel or unusual punishment under the state or federal constitutions.

### III.    DISPOSITION

The judgment is affirmed.

20

_____
Márquez, J.

WE CONCUR:



_____
 Rushing, P. J.




_____
 Grover, J.